IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2026 Term

No. 23-456

**FILED**

**May 13, 2026**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent,

v.

CARL RAY SUMMERFIELD,
Defendant Below, Petitioner.

Appeal from the Circuit Court of Grant County
The Honorable Lynn A. Nelson
Case No. 22-F-17

AFFIRMED

Submitted:  January 14, 2026
Filed:  May 13, 2026

Jeremy B. Cooper, Esq.
Blackwater Law PLLC
Pittsburgh, Pennsylvania
and
J. Brent Easton, Esq.
Brent Easton Attorney at Law PLLC
Davis, West Virginia
Counsel for the Petitioner

John B. McCuskey, Esq.
Attorney General
Caleb A. Seckman, Esq.
Assistant Solicitor General
Andrea Nease Proper, Esq.
Deputy Attorney General
Charleston, West Virginia
Counsel for the Respondent

JUSTICE TITUS delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal:  (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters."  Syl. Pt. 6, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995).

2.      "A trial court's refusal to give a requested instruction is reversible error only if:  (1) the instruction is a correct statement of the law; (2) it is not substantially covered in the charge actually given to the jury; and (3) it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense."  Syl. Pt. 11, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994).

3.      "'The failure of the State to provide a transcript of a criminal proceeding for the purpose of appeal, absent extraordinary dereliction on the part of the State, will not result in the release of the defendant; however, the defendant will have the option of appealing on the basis of a reconstructed record or of receiving a new trial.'  Syl. pt. 2, *State ex rel. Kisner v. Fox*, [165] W.Va. [123], 267 S.E.2d 451 (1980)."  Syl. Pt. 1, *State v. Shafer*, 168 W. Va. 474, 284 S.E.2d 916 (1981).

i

4. "Omissions from a trial transcript warrant a new trial only if the missing portion of the transcript specifically prejudices a defendant's appeal." Syl. Pt. 8, *State v. Graham*, 208 W. Va. 463, 541 S.E.2d 341 (2000). .

TITUS, J.:

In May 2023, Carl Ray Summerfield was convicted of first-degree murder and use of a firearm during the commission of a felony for the shooting death of Wesley Rohrbaugh. By order dated June 23, 2023, Mr. Summerfield was sentenced to life imprisonment without mercy for first-degree murder and to a consecutive term of five years for use of a firearm during the commission of a felony. Before this Court, Mr. Summerfield argues that the circuit court erred by failing to: (1) grant a mistrial and/or a new trial based upon impermissible prosecutorial comments during closing argument; (2) give a "missing witness" instruction; and (3) grant his motion for judgment of acquittal based upon the State's reliance on inherently incredible testimony. In addition, he asserts that he is entitled to a new trial due to the omission of bench conferences from the trial transcript.

Upon careful review of the briefs, the appendix record, the arguments of the parties, and the applicable legal authority, we conclude that the circuit court did not err and affirm the convictions.

## I. FACTUAL AND PROCEDURAL HISTORY

On the morning of February 5, 2022, the Grant County Sheriff's Department was dispatched to Allen's Trailer Park[1] in Cabins, Grant County, West Virginia. Upon arrival, Lieutenant Kirk Thorne met with several individuals who informed him that they found a body in a garage on the property. Lieutenant Thorne entered the garage and found the body of Wesley Rohrbaugh. Approximately five months later, a Grant County grand jury returned an indictment charging Mr. Summerfield with first-degree murder[2] and use of a firearm during the commission of a felony.[3]

Mr. Summerfield's trial began on May 11, 2023.[4] At trial, the State asserted that Mr. Summerfield shot and killed Mr. Rohrbaugh on February 1, 2022, with a gun that he had taken from Mitch Allen. The State called many witnesses during the trial including Jared Michael, who testified that he and his significant other, Tammy Lofton, were visiting with Mr. Rohrbaugh in a pop-up camper when Mr. Summerfield entered. According to Mr. Michael, Mr. Summerfield and Mr. Rohrbaugh began arguing and, at some point, Mr.

---

[1] During the proceedings below and before this Court, the trailer park where the victim was found has been referred to as "Allen's Trailer Court," "Allen's Mobile Village," "Allen's Trailer Park," "Allen's Mobile Trailer Court," and "Allen's Trailer Village Park." For ease of reference, we will refer to this area as "Allen's Trailer Park."

[2] W. Va. Code § 61-2-1.

[3] W. Va. Code § 61-7-15a.

[4] This date reflects the first day of Mr. Summerfield's second trial as his first trial resulted in a mistrial.

Summerfield produced a gun and pointed it at Mr. Rohrbaugh. Mr. Summerfield struck Mr. Rohrbaugh with the gun and said that "he didn't want to make a mess in the camper" so he convinced Mr. Rohrbaugh to go to the garage, where Mr. Rohrbaugh was later found dead from a gunshot wound. After leaving the pop-up camper, Mr. Michael heard a couple of gunshots, then he heard Mr. Rohrbaugh ask why he had been shot. Following the gunshots, Mr. Michael saw Mr. Summerfield's stepfather and Mr. Summerfield exit the garage. Mr. Summerfield then told Mr. Michael and Ms. Lofton that if they said anything that they would "be next."

Ms. Lofton's testimony was consistent with Mr. Michael's testimony concerning their interactions with Mr. Summerfield and Mr. Rohrbaugh prior to the shooting. In addition, Ms. Lofton testified that after she left the pop-up camper, she ran into Mr. Summerfield's sister and helped her pick up some items that had spilled. While they were working together, Ms. Lofton heard two gunshots coming from the garage and then she heard Mr. Rohrbaugh ask Mr. Summerfield why he had shot him. According to Ms. Lofton, when Mr. Summerfield left the garage, he walked over to his sister and said "I killed him." Ms. Lofton testified that she stood there in shock after hearing Mr. Summerfield's confession. Eventually, Ms. Lofton walked over to Jared Michael, thereupon Mr. Summerfield came over to them and said that if they said anything that they would "be next."

Additional evidence elicited at trial revealed that Mr. Rohrbaugh's body was found in a garage in Allen's Trailer Park in the early morning hours of February 5, 2022. The individuals who found Mr. Rohrbaugh's body went to the home of Kristina Weese, a fellow Allen's Trailer Park resident, and informed her of their discovery. Ms. Weese went to the garage, confirmed that it was the body of Wesley Rohrbaugh, and then called 9-1-1. The medical examiner, Dr. Jacqueline Benjamin, testified that Mr. Rohrbaugh had a contusion on the left side of his forehead and four gunshot entrance wounds. Two gunshot wounds were found on Mr. Rohrbaugh's left arm, though those wounds were likely not immediately fatal. The gunshot wound to his head caused extensive trauma, which likely lead to his death within minutes. Dr. Benjamin concluded that Mr. Rohrbaugh's manner of death was a homicide and that his cause of death was from multiple gunshot wounds. According to the firearms experts, the murder weapon was a Glock Gen 5 pistol.

The State theorized that the pistol used to kill Mr. Rohrbaugh belonged to Mitch Allen but went missing and eventually ended up in the possession of Jeremiah Dean. At trial, Mitch Allen testified that he purchased a "Glock Model 23, 5th Generation" pistol on December 28, 2021, and that the following month, it went missing. Mr. Allen testified that, after his gun went missing, Mr. Summerfield pistol whipped him with a gun that he believed was his missing Glock pistol. The jury also heard Jeremiah Dean testify that he overheard Mr. Summerfield say that he had a firearm for sale. Mr. Dean approached Mr. Summerfield and negotiated a deal to obtain the firearm. During a second meeting between

4

Mr. Dean and Mr. Summerfield, Mr. Summerfield "frantically want[ed] the gun back." Mr. Dean told Mr. Summerfield that he had taken the gun to his mother's house so it would take some time for him to retrieve it. Mr. Dean testified that, in reality, he had already sold the gun. During this second meeting, Mr. Dean asked Mr. Summerfield if the gun he obtained from him was the same gun that had been used to kill Mr. Rohrbaugh, and Mr. Summerfield responded "yes." At trial, Mr. Dean testified that he thought the pistol he purchased from Mr. Summerfield was a Glock 40, 2nd generation.

During closing arguments, the Prosecuting Attorney made two comments which form the basis for one of the issues on appeal. The first comment occurred during the State's closing argument when the Prosecuting Attorney said:

> Don't be hesitant, it's your sworn duty to do your job. You all know what your job is. None of you wanted it, none of you relish it but you know what it is. It's your duty as a United States citizen. As a citizen of West Virginia and particularly of Grant County. You will send a message with your verdict. And your message will be, this is what's permitted in Grant County.

Counsel for Mr. Summerfield immediately objected and said "[y]ou're not allowed to instruct the jury to send a message to the community." The circuit court sustained the objection and directed the State to "[m]ove on." During the State's rebuttal closing argument, the Prosecuting Attorney indicated that he wanted to introduce the jury to the victim's father. Counsel for Mr. Summerfield objected and after a bench conference, the Court instructed the jury as follows: "Ladies and Gentlemen, do not consider the last remarks the Prosecuting Attorney made where he introduced the family. Certainly,

5

everybody has a family and I imagine both families are very upset about this situation but do not take into account what the Prosecutor just said."

Mr. Summerfield's trial concluded on May 15, 2023, and the jury found him guilty of both counts charged in his indictment, first-degree murder and use of a firearm in the commission of a felony. The jury did not recommend mercy on the first-degree murder conviction. By order entered on June 23, 2023, the circuit court sentenced Mr. Summerfield to life imprisonment without mercy for first-degree murder and to a consecutive term of imprisonment for five years for use of a firearm in the commission of a felony.

Mr. Summerfield appeals his convictions.

## II. STANDARD OF REVIEW

In two of Mr. Summerfield's assignments of error, he asserts that the circuit court erred by failing to grant a mistrial and/or a new trial. This Court has held: "The decision to grant or deny a motion for mistrial is reviewed under an abuse of discretion standard." *State v. Lowery*, 222 W. Va. 284, 288, 664 S.E.2d 169, 173 (2008). "We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard," the court's factual findings are reviewed for clear error, and questions of law are reviewed de novo. Syl. Pt. 3, in part, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000).

6

Mr. Summerfield also assigns error to the circuit court's refusal to give one of his proposed jury instructions. "As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion." Syl. Pt. 1, in part, *State v. Hinkle*, 200 W. Va. 280, 489 S.E.2d 257 (1996). With respect to the denial of Mr. Summerfield's motion for judgment of acquittal, this "Court applies a de novo standard of review to the denial of a motion for judgment of acquittal based upon the sufficiency of the evidence." *State v. Juntilla*, 227 W. Va. 492, 497, 711 S.E.2d 562, 567 (2011) (citation omitted).

## III. DISCUSSION

In his appeal before this Court, Mr. Summerfield argues that the circuit court erroneously: (1) denied his motion for a mistrial and/or a new trial based upon impermissible prosecutorial comments during closing argument; (2) failed to give a "missing witness" instruction; and (3) denied his motion for judgment of acquittal based upon the State's reliance on inherently incredible testimony. He also asserts that he is entitled to a new trial due to the omission of bench conferences from the trial transcripts.

A.     IMPROPER PROSECUTORIAL COMMENTS

In his first assignment of error, Mr. Summerfield argues that the circuit court erred by failing to grant a mistrial and/or a new trial based upon two impermissible prosecutorial comments made during the State's closing argument. During the State's

7

closing argument, the Prosecuting Attorney told the jury that it would "send a message" with its verdict. Immediately following this comment, counsel for Mr. Summerfield objected and said "[y]ou're not allowed to instruct the jury to send a message to the community." The circuit court sustained the objection and instructed the Prosecuting Attorney to "[m]ove on." During the State's rebuttal closing argument the Prosecuting Attorney indicated his intention to introduce the jury to Mr. Rohrbaugh's father. This comment was immediately followed by an objection and a bench conference, which resulted in the circuit court instructing the jury as follows: "Ladies and Gentlemen, do not consider the last remarks the Prosecuting Attorney made where he introduced the family. Certainly, everybody has a family and I imagine both families are very upset about this situation but do not take into account what the Prosecutor just said."

As we have previously noted, "[l]awyers customarily receive wide latitude in making their closing arguments and any alleged improper prosecutorial comments must be considered in the context of the facts of the case." *State v. Lyon*, 250 W. Va. 90, 100, 902 S.E.2d 422, 432 (2024). Our analysis of this claim is guided by syllabus point six of *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995):

> Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4)

8

whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

*Sugg* also "clarified that not every improper prosecutorial remark will result in reversal of a conviction: 'A judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice.'" *State v. Mills*, 219 W. Va. 28, 35, 631 S.E.2d 586, 593 (2005) (quoting Syl. Pt. 5, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995)).

In support of this assignment of error, Mr. Summerfield argues that the State's invitation to "send a message" and its reference to the victim's father were "successfully communicated to the jury" and that a curative instruction was an "insufficient remedy" in his case. In addition, Mr. Summerfield contends that because the mercy phase of his trial was not bifurcated, the prejudice is deepened. We disagree that these statements require reversal.

We conclude that reversal of Mr. Summerfield's convictions is not warranted because the comments do not clearly prejudice the accused or result in manifest injustice. Relating to the first *Sugg* factor, to the extent that the comments had any tendency to mislead the jury or to prejudice Mr. Summerfield, the circuit court's instructions to the jury minimized the degree of the effect of those remarks. While Mr. Summerfield asserts that the circuit court's handling of these comments was insufficient and that a curative instruction cannot address the improper remarks at issue, this position is contrary to this

9

Court's prior directive that we must consider the "ameliorative effect of any curative instruction given" in determining prejudice. *State v. Guthrie*, 194 W. Va. 657, 684, 461 S.E.2d 163, 190 (1995). In addition to the immediate curative instruction given relating to the Prosecuting Attorney's statement about the victim's father, as well as the sustained objection regarding the jury "sending a message," the jury in this case was also instructed that comments made by the lawyers were not to be considered as "evidence of any fact." The jury was also cautioned that its verdict should not be "based upon the statements made to [them] by the lawyers, either at the opening of the trial or their closing [] arguments as they are not evidence." Further, despite Mr. Summerfield's arguments to the contrary, the two comments at issue were isolated, not extensive.[5]

We are also not persuaded by Mr. Summerfield's assertion that, absent these comments, it is unclear whether the jury would have rendered the same verdict, especially on the question of mercy. The State introduced overwhelming "competent proof" to establish Mr. Summerfield's guilt. *Sugg*, 193 W. Va. at 393, 456 S.E.2d at 474, Syl. Pt. 6. The evidence demonstrates that Mr. Summerfield struck Mr. Rohrbaugh with a pistol before taking him to the garage and shooting him multiple times. The jury heard that Mr. Summerfield took Mr. Rohrbaugh to the garage because he did not want to make a mess in the camper. Further, the jury heard about Mr. Summerfield's confession to his sister and

---

[5] We also note that following the circuit court's rulings on these comments, the Prosecuting Attorney moved on and did not return to these topics.

his threat to a couple that they would be "next" if they said anything. Witnesses also described finding Mr. Rohrbaugh's body in the garage days after the shooting. We are also unpersuaded by Mr. Summerfield's unsupported assertion that the prejudice in his case is "deepened" by his unitary trial. For these reasons, we do not find that the prosecutor's remarks clearly prejudiced Mr. Summerfield or resulted in manifest injustice, and Mr. Summerfield is not entitled to any relief on this ground.[6]

B.     MISSING WITNESS INSTRUCTION

In his second assignment of error, Mr. Summerfield argues that the circuit court erred by failing to give his "missing witness" instruction, which he offered as Defense Instruction "A." This instruction at issue was filed on May 12, 2023, and taken up by the circuit court on the final day of trial, May 15, 2023. The instruction read as follows:

> MISSING WITNESS:
>
> The Court instructs the jury that the failure of the State to call available material witnesses gives rise to the inference that had those witnesses testified, their testimony would have been adverse to the State's case.

---

[6] As part of this assignment of error, Mr. Summerfield argues that the circuit court's reasoning for denying his post-trial motion on this issue is unsupported by the record. In its order denying Mr. Summerfield's post-trial motions, the circuit court indicated that the jury had been instructed, at the request of the State, to disregard the "sending a message" comment, which is not borne out in the trial transcript. To the extent that we have concluded that these isolated statements do not clearly prejudice Mr. Summerfield or result in manifest injustice, we note that "[t]his Court may, on appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment." Syl. Pt. 3, *Barnett v. Wolfolk*, 149 W. Va. 246, 140 S.E.2d 466 (1965).

11

[Source: *McGlone v. Superior Trucking Co., Inc.*, 178 W. Va. 659, 363 S.E.2d 736 (1987); F. Cleckley, *Handbook on Evidence for West Virginia Lawyers*, Section 3-1(c)(J) (3rd Ed. 2003); Russell S. Cook, *West Virginia Criminal Jury Instructions*, p. 52 (6th Ed. 2003).]

Before the circuit court, Mr. Summerfield described the instruction as follows: "It's an Instruction about missing witness [sic] where the State had the opportunity to call an available witness and did not. That leads to an inference that the testimony would have been adverse to the State's case." The "missing witnesses" were Mr. Summerfield's sister, Caterina Mullins, and his mother, Denise Shanholtz, and according to Mr. Summerfield, his sister and his mother were material witnesses. At the time of Mr. Summerfield's trial, his sister was alleged to have been in the custody of the Department of Corrections and Rehabilitation, and his mother had been present in the courtroom throughout his trial. Following the circuit court's refusal to give the instruction, Mr. Summerfield orally requested an alternative instruction that the jury "may draw an adverse inference from a missing witness." When the circuit court followed up on Mr. Summerfield's request for an alternative instruction and asked counsel what was being requested, Mr. Summerfield's counsel replied: "That the Court instructs the jury that States [sic] failure to call an available witness in this case Denise Shanholtz and Caterina Mullins leads to an adverse inference that the testimony would have been adverse to the State's case or something along those lines is what I put in the . . . ."

This Court has held that:

12

> A trial court's refusal to give a requested instruction is reversible error only if: (1) the instruction is a correct statement of the law; (2) it is not substantially covered in the charge actually given to the jury; and (3) it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense.

Syl. Pt. 11, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994).

The source of Mr. Summerfield's missing witness instruction is *McGlone v. Superior Trucking Co., Inc.*, 178 W. Va. 659, 363 S.E.2d 736 (1987), which held that "[t]he unjustified failure of a party in a civil case to call an available material witness may, if the trier of the facts so finds, give rise to an inference that the testimony of the 'missing' witness would, if he or she had been called, have been adverse to the party failing to call such witness." *Id.* at Syl. Pt. 3, in part. The parties offer competing views as to whether or not the instruction or the alternative instruction was a correct statement of law and whether *McGlone* applies in a criminal context.

We conclude that our prior holding in *Pullin v. State*, 216 W. Va. 231, 605 S.E.2d 803 (2004) is dispositive on this issue. In *Pullin*, this Court took the opportunity to address a criminal defendant's argument that the trial court erred by refusing to give his missing witness instruction.[7] Ultimately, *Pullin* concluded that because the defendant admitted that he could have called the missing witness, the trial court properly refused to

---

[7] Although *Pullin* reversed on another ground, this Court took the opportunity to address the missing witness issue "because the issue could arise again during a retrial of [that] case." *Id.* at 235–36, 605 S.E.2d at 807–08.

13

give a missing witness instruction. *Id*. at 236, 605 S.E.2d at 808 (stating that "a missing witness instruction is not warranted if the defense does not adequately show that the government possesses the sole power to produce the witness." (internal quotation marks and citations omitted)); *see, e.g.*, *United States v. Montoya*, 676 F.2d 428, 431 (10th Cir. 1982) (explaining that a missing witness "instruction is not warranted unless it is solely within the prosecution's power to call the witness to testify.").

Much like the defendant in *Pullin*, Mr. Summerfield admits that "he could have called his mother and/or sister to testify" below. He further acknowledges that this Court's holding in *Pullin* supports the circuit court's refusal to give his missing witness instruction. Even so, Mr. Summerfield asks this Court reject the rationale in *Pullin*, claiming it was dicta and because he believes that it "improperly dilutes the State's burden of proof and [his] right to refrain from putting on evidence." We see no reason to reject the rationale in *Pullin* as it relates to a missing witness instruction in a criminal trial.[8]

We discern no abuse of discretion on the part of the circuit court for its refusal to give a missing witness instruction.

C.     INHERENTLY INCREDIBLE TESTIMONY

---

[8] In reaching this decision, we do not address whether the witnesses at issue were material.

In his third assignment of error, Mr. Summerfield challenges the sufficiency of the evidence to sustain his convictions. Specifically, he argues that the circuit court abused its discretion by denying his motion for judgment of acquittal based upon the State's reliance on what he characterizes as the inherently incredible testimony of Jeremiah Dean.

The State theorized that Mr. Summerfield killed Mr. Rohrbaugh with a gun that subsequently ended up in the possession of Jeremiah Dean. Mr. Dean testified that he received a Glock "Generation 2" pistol from Mr. Summerfield. Mr. Dean also testified that Mr. Summerfield told him that the gun he purchased from him was the "gun that was used for the murder" of Mr. Rohrbaugh. However, the firearms experts who testified at trial, Mr. Theodore Chavez and Mr. Todd Neumyer, testified that only certain models of Generation 5 Glock pistols could have fired the shots that killed Mr. Rohrbaugh. For these reasons, Mr. Summerfield contends that "it is physically impossible for the firearm described by Mr. Dean to have been the murder weapon."

"A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden." Syl. Pt. 3, in part, *Guthrie*, 194 W. Va. 657, 461 S.E.2d 163. The relevant inquiry that we must make is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." *Id.* at 663, 461 S.E.2d at 169, Syl. Pt. 1, in part. The jury's verdict in this case can be "set aside only

15

when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Id.* at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part. Further, with respect to Mr. Summerfield's argument that he is entitled to acquittal due to the State's reliance on inherently incredible testimony, we have explained that inherent incredibility requires "more than contradiction and lack of corroboration." *State v. McPherson*, 179 W. Va. 612, 617, 371 S.E.2d 333, 338 (1988). When discussing the inherent incredibility of a witnesses, we have also noted that "[w]hen a trial court considers the testimony of a witness to be so inherently incredible that it is completely untrustworthy, the trial court may be justified in excluding that witness's testimony as a matter of law." *State v. Humphrey*, 177 W. Va. 264, 271, 351 S.E.2d 613, 619 (1986). Likewise, "[w]hen a trial court is asked to grant a motion for acquittal based on insufficient evidence due to inherently incredible testimony, it should do so only when the testimony defies physical laws." *McPherson*, 179 W. Va. at 617, 371 S.E.2d at 338.

The crux of Mr. Summerfield's argument is that the firearm described by Mr. Dean could not have been the murder weapon because Mr. Dean mentioned a Generation 2 Glock pistol and the experts testified that only certain models of Generation 5 Glock pistols could have fired the shots that killed Mr. Rohrbaugh. However, a review of Mr. Dean's testimony belies this argument. During cross-examination, Mr. Dean described the gun that he got from Mr. Summerfield as a "Glock 40 2nd Gen[,]" but his testimony on direct examination was not quite as certain. Specifically, Mr. Dean described the gun as follows: "It was a Glock 40 *I think* 2nd Gen pistol. It was black." (Emphasis added). During

16

cross-examination, Mr. Dean was unable to provide the model of the gun. In fact, in response to questions regarding the model, Mr. Dean testified, "I have no idea what you mean" and "[a]ll I know is what it said on the gun. I'm not real familiar with guns." Mr. Summerfield's own expert, Mr. Neumyer, testified that he did not know "if Mr. Dean would know a Glock 1st Generation, 2nd Generation, 3rd Generation, Gen 4 or Gen 5 one from the other."

The State disputes that Mr. Dean's testimony was inherently incredible and suggests that there was a potential contradiction between the witnesses' testimonies on this issue that could have been resolved by the jury in several different ways. According to the State, there are numerous conclusions that could have been drawn by the jury that do not defy physical laws. For example, the jury may have believed that Mr. Dean misidentified the model and generation of the pistol that he got from Mr. Summerfield and still believed Mr. Dean's testimony about Mr. Summerfield's confession—that Mr. Summerfield told Mr. Dean that the gun was the same gun that had been used to kill Mr. Rohrbaugh. This type of credibility determination is for the jury. We "cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations." *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) (internal citation omitted).

17

We disagree with Mr. Summerfield's assertion that Mr. Dean's testimony was inherently incredible. Mr. Dean was repeatedly questioned about the type of gun he purchased from Mr. Summerfield, and we have detailed some of his responses *supra*. Mr. Dean clearly testified that he was "not real familiar with guns," and Mr. Summerfield's expert noted that he did not know if Mr. Dean would know the different generations of Glock pistols. Arguably, there was a potential contradiction between Mr. Dean's testimony and the testimony of the expert witnesses, but in order to prevail on this assignment of error, Mr. Summerfield was required to show something "more than [a] contradiction." *McPherson*, 179 W. Va. at 617, 371 S.E.2d at 338. His failure to make such a showing is fatal to this assignment of error.

D.    MISSING BENCH CONFERENCES

In his final assignment of error, Mr. Summerfield asserts that he is entitled to a new trial because the bench conferences that occurred during his trial were incapable of being transcribed. The facts underlying this assignment of error appear to be undisputed. While preparing his brief, counsel for Mr. Summerfield became aware that some bench conferences during the trial below were omitted from the trial transcripts.[9]    Counsel

---

[9] Because Mr. Summerfield did not become aware that the bench conferences were incapable of being transcribed until after his trial concluded, he had no reason to object during the trial.

contacted a court reporter[10] to inquire about the bench conferences and was informed that recordings from the bench conferences were "mostly inaudible except for some stray words due to the use of a white-noise machine during trial."

Mr. Summerfield details eight bench conferences that were not transcribed but identifies only three bench conferences at issue.[11] The first bench conference at issue occurred during voir dire when counsel for Mr. Summerfield asked to approach. Immediately thereafter, Mr. Summerfield's counsel conducted individual voir dire, which followed up on answers from juror questionnaires. The second bench conference at issue was requested by counsel for Mr. Summerfield and occurred during the testimony of Jared Michael while he was describing the gun that Mr. Summerfield produced while he was in the pop-up camper with Mr. Rohrbaugh. Other than counsel's request to approach, there is no further discussion on the record as to what transpired in either of these bench conferences. The third and final bench conference at issue was requested by counsel for Mr. Summerfield and occurred immediately after Lieutenant Thorne testified about his interview of Mr. Summerfield's sister. According to Mr. Summerfield, this bench conference is "clearly relevant to his second assignment of error" as the testimony related

---

[10] The court reporter who was contacted and responded was not the court reporter who attended Mr. Summerfield's trial.

[11] J. Brent Easton, who represented Mr. Summerfield at trial and is also representing Mr. Summerfield in the instant appeal, made the requests for these three bench conferences.

to interviews of Mr. Summerfield's sister and mother, who he claims are the missing witnesses at issue in his second assignment of error.[12]

Mr. Summerfield's belief that he is entitled to a new trial is based, in part, upon our holding in *State v. Shafer*, 168 W. Va. 474, 284 S.E.2d 916 (1981), which provides:

> The failure of the State to provide a transcript of a criminal proceeding for the purpose of appeal, absent extraordinary dereliction on the part of the State, will not result in the release of the defendant; however, the defendant will have the option of appealing on the basis of a reconstructed record or of receiving a new trial. Syl. pt. 2, *State ex rel. Kisner v. Fox*, [165] W.Va. [123], 267 S.E.2d 451 (1980).

*Id.* at Syl. Pt. 1. Mr. Summerfield acknowledges, however, that "[o]missions from a trial transcript warrant a new trial only if the missing portion of the transcript specifically prejudices a defendant's appeal." Syl. Pt. 8, *State v. Graham*, 208 W. Va. 463, 541 S.E.2d 341 (2000).

Mr. Summerfield contends that the inability of the court reporter to transcribe the bench conferences is "fatal, prejudicial error." We acknowledge that the bench

---

[12] Mr. Summerfield's counsel made this request after Lieutenant Thorne indicated that his interview of Mr. Summerfield's sister was not helpful and before Lieutenant Thorne testified that the statement taken of Mr. Summerfield's mother was not helpful.

20

conferences were not transcribed.  However, this is not a per se fatal or prejudicial error.[13]

In order to prevail, Mr. Summerfield must show that the missing bench conferences specifically prejudiced his appeal.  Instead of noting specific prejudice, he generally asserts that "[t]here is no way to know from the existing record what objections were made at the bench conferences, and what rulings resulted, and what objections were preserved."

When recently faced with arguments regarding fourteen missing sidebars from a trial transcript, we noted that an appellant "cannot simply assert that the missing portions of jury selection *might* reveal the existence of error warranting reversal. Rather, [the appellant] must identify possible appellate issues which, if meritorious, would otherwise warrant a new trial." *State v. Leslie G.*, No. 22-210, 2023 WL 7299893, at *4 (W. Va. Nov. 6, 2023) (memorandum decision).  We find Mr. Summerfield's arguments regarding the prejudice he suffered to be speculative, not specific.  Further, our conclusion that the circuit court did not err by refusing to give a missing witness instruction does not support Mr. Summerfield's argument that he was prejudiced by the omission of the third bench conference.  For these reasons, we conclude that he is entitled to no relief on this issue.[14]

---

[13] We have not previously adopted a rule of per se reversal for omissions in trial transcripts, and we decline to do so now.

[14] Although we find no prejudice in the case *sub judice*, we reiterate to our trial courts that "all proceedings in the criminal trial are required to be reported[.]"  Syl. Pt. 5, in part, *State v. Bolling*, 162 W. Va. 103, 246 S.E.2d 631 (1978).  At the time *Bolling* was

21

## IV. CONCLUSION

For the foregoing reasons, we affirm the June 23, 2023 order of the Circuit Court of Grant County sentencing Mr. Summerfield to life imprisonment without mercy for first-degree murder and to a consecutive term of imprisonment for five years for use of a firearm during the commission of a felony.

Affirmed.

---

decided, this Court had not yet had the opportunity "to consider what must be reported in a criminal trial" under our statutory provisions, West Virginia Code §§ 51-7-1 and -2. 162 W. Va. at 113, 246 S.E.2d at 637. After concluding that our statutes, *supra*, were similar to the federal court reporter statute, this Court concluded that we needed a rule similar to the federal courts. Thus, we announced our holding that "[u]nder the provisions of W. Va. Code 57-7-1 and -2, all proceedings in [a] criminal trial are required to be reported; however, the failure to report all of the proceedings may not in all instances constitute reversible error." *Bolling*, 162 W. Va. at 104, 246 S.E.2d at 632, Syl. Pt. 5.

"The importance of a trial transcript to a defendant in a criminal case is obvious." *State v. Neal*, 172 W. Va. 189,191, 304 S.E.2d 342, 345 (1983). In addition to the statutory requirements discussed in *Bolling*, there are "constitutional aspects of securing transcripts in criminal cases." *Id.* at 192 n.5, 304 S.E.2d at 345 n.5. With respect to the constitutional aspects, we have held that "[t]he Due Process Clause of the state and federal constitutions requires that a convicted defendant be furnished a trial transcript for which he has made a timely request." Syl. Pt. 1, *State ex rel. Johnson v. McKenzie*, 159 W. Va. 795, 226 S.E.2d 721 (1976).

22